1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11

PORT OF VANCOUVER USA,

                 Plaintiff,

12

     v.

13

BNSF RAILWAY COMPANY,

14

                Defendant.

15

CASE NO. 3:24-cv-06033-DGE

ORDER GRANTING MOTION TO
CONFIRM ARBITRATION
AWARD (DKT. NO. 24) AND
DENYING MOTION TO VACATE
(DKT. NO. 21)

16

**I      INTRODUCTION**

17

      Before the Court are cross-motions to confirm an arbitration award (Dkt. No. 24) or to

18

vacate the same (Dkt. No. 21.)  This case concerns a dispute between the Port of Vancouver

19

USA ("POV") and BNSF Railway Company ("BNSF"), regarding the rates BNSF charges to

20

other railways that use POV facilities, and related issues.  In a previous iteration of this case, this

21

Court dismissed an action seeking to enforce an arbitral award, finding that the Panel's decision

22

was too ambiguous for judicial enforcement.  *Port of Vancouver USA v. BNSF Ry. Co.*, 717 F.

23

Supp. 3d 1016 (W.D. Wash. 2024).  On remand, the Parties agreed on questions to be answered

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 1

1    by the Panel in response to the Court's order, and the Panel issued a new opinion, over a dissent.

2    (*See* Dkt. No. 27 at 7–8.)  BNSF now argues that the Panel exceeded the scope of this Court's

3    leave to remand, while POV argues that the Panel appropriately addressed the issues raised in the

4    Court's prior order.  The Court agrees with POV that the Panel acted within the scope of this

5    Court's remand order, and accordingly GRANTS the motion to confirm and DENIES the motion

6    to vacate.

## II      BACKGROUND

8        In 2008, POV and BNSF entered into a contract, the West Vancouver Freight Access and

9    Industrial Track Agreement ("WVFAA") that designates BNSF as the "Exclusive Rail Operator"

10   at POV.  (Dkt. No. 21 at 7.)  The contract contains a mandatory arbitration clause, and since

11   2020, the Parties have been arbitrating a series of disputes.  (*Id.*)  There are three discreet issues

12   in dispute here: 1) the rates that BNSF charges to competitor railways, namely Union Pacific

13   ("UP"), for access to POV, 2) the geographic areas in which those rates apply, and 3) BNSF's

14   placement of "alien cars"—meaning "BNSF rail cars not destined for, or originating from, Port

15   tenants"—on POV property.  (*Id.*)  An arbitration Panel issued a Partial Final Award on May 9,

16   2022 and a Final Award on December 19, 2022, which were confirmed by stipulation.  *Port of*

17   *Vancouver USA v. BNSF Ry. Co*, Case No. 3:23-cv-05109-JNW, Dkt. Nos. 19-1, 19-2, 20 (W.D.

18   Wash. June 7, 2023) ("*Port of Vancouver I*").  Two weeks later, POV brought suit seeking

19   enforcement of the judgment based on BNSF's alleged noncompliance.  *Port of Vancouver USA*,

20   717 F. Supp. 3d at 1020.

21       This Court dismissed the enforcement action, holding that the arbitration Panel's decision

22   was ambiguous as to each of the disputed issues.  As to rates, the Panel stated it was "'not

23   prepared to act as a rate-setting board' and imposed only a 'requirement that BNSF offer to UP

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 2

1   customers switching rates no greater than rates BNSF offers to its own linehaul customers

2   bringing comparable quantities and characteristics of freight under similar conditions.'" *Id.* at

3   1024. The Panel "expected the Port and BNSF to develop a mutually satisfactory schedule of

4   rates." *Id.* (alteration omitted). But the Court noted that "[t]he Panel's comments of what it

5   'expects' and what BNSF 'could' do provide little to work with in terms of concrete

6   instructions." *Id.* Because "[t]his commentary contains no standard or calculation capable of

7   application with amount of certainty" the Court could not enforce it. *Id.* at 1025.

8        As to the second issue, the Panel noted that the WVFAA "appears to contemplate

9   competitive access to the entire Port (with the exceptions noted in Article III § 3 A (iii))" but it

10   failed to address whether areas other than Terminals 4 and 5 were included within this access,

11   did not interpret the exceptions in the agreement, and "fail[ed] to define 'access' in any

12   measurable way." *See id.* (emphasis omitted). As to the final issue, the Panel ordered BNSF to

13   pay a rate of $7 per car for storage of alien cars on POV property, but failed to specify whether

14   the rate applied prospectively, and "did not say whether the presence of *any* alien car violates the

15   agreement." *Id.* at 1026. On these grounds, the Court dismissed POV's enforcement action, for

16   the parties to resolve the outstanding issues through further arbitration. *See id.*

17        After this Court's order, the Parties designated three questions to be answered by the

18   arbitration Panel on remand:

19       1.1 How to determine what constitutes a reasonable and customary rate for …
           Commercial Access;

20

21       1.2 What did the Panel mean by "access to the entire Port (with the exceptions noted in
           Article III § 3 A (iii)," and whether that included "shippers located at Terminals 2 and
           3;" and

22

23       1.3 Whether, under what circumstances, and to what extent BNSF is permitted to bring
           [alien] rail cars on to Port property," and if so "was the $7 per car damages
           established by the Panel intended to apply prospectively."

24

(Dkt. No. 27 at 7–8.)  The Panel consisted of three members, two of whom were party arbitrators

selected by each of the Parties, respectively, and the third jointly selected as Panel chair.  (Dkt.

No. 25 at 1.)  The same Panel issued both the initial opinion and the new decision on remand.

(*See* Dkt. No. 21 at 27.)

On December 12, 2024, the Panel issued a Statement of Reasons for Award Upon

Remand ("2024 Remand Award"), addressing the issues designated by the Parties and the

Court's order.  (*See* Dkt. No. 24-1.)  As to rates, the Panel found that "BNSF has imposed

notably higher rates for the Port compared to its competing Pacific coast ports. . . . The notably

higher rates BNSF charges at the Port demonstrates that notwithstanding the Panel's award,

BNSF has continued the course that gave rise to the POV's claims and which the final Award

was intended to correct."  (*Id.* at 10.)  The best measure of "reasonable and customary rates" is

the rate schedule that BNSF charges at other Pacific coast ports, which is Switching Book 8005-

E.  (*Id.*)  The Panel further noted that "BNSF's imposition of substantially higher rates at the Port

as opposed to those charged at competing ports removes any doubt that POV's contentions about

BNSF's discriminatory conduct are well taken."  (*Id.* at 13.)  Therefore, the Panel held:

> [T]he terms of the WVFAA require BNSF to offer switching rates to UP shippers at the
> Port consistent with such rates charged to UP shippers at other nearby Pacific Coast
> ports. For this purpose, the Switching Book 8005-E rates for those ports shall be
> presumed reasonable and customary and applied by BNSF for commercial access to the
> Port from the date of confirmation of this Remand Award pending agreement by the
> Parties that adjustments are necessary to account for switching cost differences or
> competitive considerations relevant to the purposes of this award[.]

(*Id.*)  Anticipating that there would be further disputes as to rates requiring resolution, the Panel

provided a mechanism to resolve those disputes:

> If the Parties, after good faith negotiations, cannot agree whether any adjustments to the
> Switching Book 8005-E rates are necessary to account for switching cost differences or

competitive considerations relevant to the purposes of this award, the dispute, upon
notice by either Party to the other, shall be finally settled by final offer arbitration.

(*Id.*, *see also id.* at 13–14 (specifying final offer arbitration process)).

As to access, the Panel "clarifie[d] that the Final Award granted Commercial Access to

all customers in the Port except those excluded by Section 3.A.(iii) (a), (b), or (c), when Exhibit

F is read to apply only to Terminals 4 & 5." (*Id.* at 15.)  And as to alien cars, the Panel held that

> [T]he WVFAA does not permit BNSF to intentionally bring alien cars onto Port property
> or to store them there. The Panel's statement in its Final Award that "some rail cars not
> destined for POV tenants may from time to time be included in switching cars" merely
> acknowledged that it was likely that alien cars would occasionally and inadvertently end
> up on Port property.
>
> The Panel did not intend the $7 per car rate established in the Final Award to apply after
> the date of the Final Award. Whatever remedy is available to the Port for BNSF's
> advertent conveyance or storage of alien cars on Port Property after December 19, 2022
> (the effective date of the final order) was not addressed by the Final Order.

(*Id.*)  One member of the Panel, BNSF's party appointee, dissented, arguing that the Panel

impermissibly modified the prior Final Award, violating the doctrine of *functus officio*.  (*Id.* at

17–18.)  The majority reached its conclusions without citation to evidence, the dissent charged,

and impermissibly fashioned a new remedy not agreed to by the parties.  (*Id.* at 19–21.)  In sum,

"[t]he majority has not clarified the Panel's prior Award, it has reversed it." (*Id.* at 22.)

Following the 2024 Remand Award, POV petitioned this Court for confirmation, while

BNSF moved to vacate, and argues that the Court should remand to a new Panel.  (*See* Dkt. Nos.

21, 24.)

### III    LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, "at any time within one year

after the award is made any party to the arbitration may apply to the court so specified for an

order confirming the award, and thereupon the court must grant such an order unless the award is

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 5

1  vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." Among those

2  grounds for vacatur, BNSF invokes §10(a)(4), under which a district court should vacate the

3  award "where the arbitrators exceeded their powers." 9 U.S.C. §§ 10; (*See* Dkt. No. 21 at 14–

4  15.) However, the Court does not review an arbitral award *de novo*. Rather, "judicial review of

5  an arbitrator's decision 'is both limited and highly deferential.'" *Barnes v. Logan*, 122 F.3d 820,

6  821 (9th Cir. 1997). "An award will not be set aside unless it manifests a complete disregard of

7  the law. Thus, an award must be confirmed if the arbitrators even arguably construed or applied

8  the contract and acted within the scope of their authority." *Id.* (internal citation omitted).

9      Likewise, the Court's review of whether an arbitrator exceeded their authority is highly

10  deferential. An arbitrator exceeds its authority "not when they merely interpret or apply the

11  governing law incorrectly, but when the award is 'completely irrational,' or exhibits a 'manifest

12  disregard of law.'" *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997

13  (9th Cir. 2003) (internal citations omitted). "An award is completely irrational 'only where the

14  arbitration decision fails to draw its essence from the agreement.'" *Aspic Eng'g & Constr. Co. v.*

15  *ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (quoting *Comedy Club,*

16  *Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009)). "An arbitration award 'draws

17  its essence from the agreement' if the award is derived from the agreement, viewed 'in light of

18  the agreement's language and context, as well as other indications of the parties' intentions.'" *Id.*

19  (quoting *Bosack v. Soward*, 586 F.3d 1096, 1106 (9th Cir. 2009)).

20      In its motion for vacatur, BNSF further invokes a common law doctrine known as *functus*

21  *officio*. (Dkt. No. 21 at 14.) Under this doctrine, "an arbitrator may not redetermine an

22  arbitration award." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-*

23

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 6

*CIO, Loc. 631 v. Silver State Disposal Serv., Inc.*, 109 F.3d 1409, 1411 (9th Cir. 1997)

("*Teamsters*").  The rationale for this doctrine is that

> It is (a) fundamental common law principle that once an arbitrator has made and published a final award his authority is exhausted and he is functus officio and can do nothing more in regard to the subject matter of the arbitration. The policy which lies behind this is an unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a final decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion. The continuity of judicial office and the tradition which surrounds judicial conduct is lacking in the isolated activity of an arbitrator[.]

*McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, Int'l Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982), *amended sub nom. McCLATCHY NEWSPAPER v. LOCAL 46* (9th Cir. Sept. 22, 1982) (quoting *La Vale Plaza, Inc. v. R. S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967)).

But the Ninth Circuit recognizes three exceptions to *functus officio*: "It has been recognized in common law arbitration that an arbitrator can correct a mistake which is apparent on the face of his award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award." *Teamsters*, 109 F.3d at 1411 (quoting *McClatchy*, 686 F.2d at 734 n.1). The second exception, completion, "applies when an arbitration award fails to resolve an issue or 'specify the remedy in definite terms.'" *Id.*  The third exception, ambiguity, "applies when 'the award, although seemingly complete, leaves doubt whether the submission has been fully executed.'" *Id.*  (quoting *La Vale Plaza*, 378 F.2d at 573.)  Some courts have "comingled" these two exceptions.  *Id.*

## IV    ANALYSIS

### A.  The Ambiguity Exception to the *Functus Officio* Doctrine Applies

BNSF advances a global argument, that the Panel violated the doctrine of *functus officio* by redetermining matters that had already been determined in the 2022 Final Award.  (Dkt. No.

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING MOTION TO VACATE (DKT. NO. 21) - 7

1    21 at 14, 16–17.)  The Court disagrees.  First, the ambiguity exception to *functus officio* applies

2    here.  As noted *supra*, the Ninth Circuit recognizes such an exception.  *Teamsters*, 109 F.3d at

3    1411.  In a case strikingly similar to this matter, the Second Circuit recently held that the

4    ambiguity exception applies.  *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*,

5    57 F.4th 372, 381 (2d Cir. 2023).  In that case, the district court held that the arbitrator "exceeded

6    his authority in issuing an award that does not meet the standard of a reasoned opinion" and thus

7    remanded "to the arbitrator for clarification of his findings."  *Id.* at 377–378.  After remand, the

8    parties filed cross motions to confirm or vacate the award, and the district court confirmed,

9    finding that the amended award provided rationale for its findings.  *Id.* at 378.  The Second

10   Circuit affirmed, holding that "remand in such circumstances [does not] undermine the functus

11   officio doctrine's purpose, which is to prevent arbitrators from changing their rulings after

12   issuance due to outside influence by an interested party."  *Id.* at 381.  Rather, "the rationale for a

13   remand under these circumstances is consistent with this Circuit's exception to the functus officio

14   doctrine for remand of an ambiguous award for clarification."  *Id.*  The Court held that the

15   arbitrator clarified the award "consistent with the parties' intent that the arbitrator issue a

16   reasoned award," and rejected arguments for vacatur under FAA § 10(a)(4) and § 11.  *Id.* at 381–

17   383.

18       So too here, it would strain credulity to say that the arbitrator exceeded its authority by

19   redetermining issues previously decided, and was subject to improper influence, when it was

20   responding to an order of this Court requiring it to add specificity to an order that had been too

21   vague and indefinite.  To the contrary, it is unclear how the arbitration Panel on remand could

22   have responded to this Court's order, and answered the questions posed by the Parties, without

23   revisiting the prior award to some extent.  To apply *functus officio* here would put the arbitrator

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 8

1   into a Catch-22: one decision of this Court would hold that the arbitrator's award was too

2   indefinite to enforce, another would hold that the arbitrator's decision cannot be effectively

3   amended.  The Court will not impose that result.

4          **B.   The Arbitrator Did Not Exceed Its Authority By Setting Rates or Providing a**

5                 **Dispute Resolution Process**

6          Next, BNSF attacks the Panel's 2024 Remand Award as to rate setting, arguing that "by

7   imposing specific presumptive rates, the majority substantively reversed its prior determination

8   rejecting the Port's request to impose exactly those rates and finding that it was ill equipped to

9   set rates." (Dkt. No. 21 at 17.)  BNSF argues the Panel further "exceeded its powers by

10  mandating a new arbitration process to resolve rate disputes, despite having expressly disclaimed

11  authority to do so in the Final Award, and notwithstanding the existing arbitration clause to

12  which the parties agreed." (*Id.*)  The Court disagrees.

13         In the 2022 Final Award, the Panel required "BNSF [to] promptly create a schedule of

14  the various applicable reasonable and customary switching rates to be charged," but it did not set

15  a schedule of rates.  *Port of Vancouver USA*, 717 F. Supp. 3d at 1021.  Rather, the Panel

16  "expected the Port and BNSF to develop a mutually satisfactory schedule of rates," which would

17  be "no greater than rates BNSF offers to its own linehaul customers." *Id.* at 1024. (alteration

18  omitted).  But this Court held that "[t]he Panel's comments of what it 'expects' and what BNSF

19  'could' do provide little to work with in terms of concrete instructions. While recognizing

20  BNSF's potential to misuse the standard, the Panel did not set forth any *remedy* for that

21  situation." *Id*. (emphasis added).  Likewise, the Court held, "[w]hat constitutes a 'reasonable and

22  customary' rate under the award is sufficiently ambiguous." *Id.* at 1025.  In the 2024 Remand

23  Award, the Panel found that despite its prior order requiring BNSF not to price discriminate

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 9

against competitors, BNSF was still engaged in "discriminatory conduct." (Dkt. No. 24-1 at 10, 13.) In response to BNSF's ongoing conduct and this Court's order, the Panel did not invent a schedule of rates out of whole cloth, but rather reached for a readily available measure of "reasonable and customary" rates: the same rates BNSF charges UP at its other Pacific coast ports, as measured in Switching Book 8005-E. (*Id.* at 13.) In this way, the Panel avoided becoming a "rate setting body" itself, while still providing a definite and enforceable standard in response to this Court's order. At the same time, the Panel recognized that deviations from Switching Book 8005-E might be necessary for "switching cost differences or competitive considerations relevant to the purposes of this award," and it provided a mechanism for the Parties to resolve disputes on any such deviation. (*Id.*)

The Court finds that the Panel did not overstep either by designating final offer arbitration as the method by which future disputes under the rate schedule would be resolved. First, the Court finds that the Panel's selection of final offer arbitration to resolve disputes is consistent both with the Parties' submissions and with the 2022 Final Award. In 2022, BNSF *itself* proposed to the Panel implementation of an ADR process to "supplement the formal WVFAA procedures . . . in the event disputes arise over the validity of BNSF's market-based rates." (Dkt. No. 28 at 43.) The 2022 Final Award declined to adopt BNSF's proposed remedy, but suggested that something akin to final offer arbitration would be appropriate. The 2022 Final Award stated:

> While BNSF has proposed what it called "an engagement process," intended to be more expeditious and less formal than an arbitration, it does not appear that the parties have come to agreement on such a process. It would be beyond the panel's remit to fashion one out of whole cloth. The parties could achieve an efficient process to resolve rate disputes by submitting competing proposals to a pre-selected monitor who is authorized to select only one of the proposals without altering the terms of the proposal selected.

(*Port of Vancouver I*, Dkt. No. 2-3 at 21) (internal citation omitted.)

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING MOTION TO VACATE (DKT. NO. 21) - 10

1    Ultimately, this Court found that it would be necessary for the Panel to make some choice

2    as to resolving disputes about rate setting.  The Court noted that the panel "recogniz[ed] BNSF's

3    potential to misuse the standard" (with respect to setting equitable rates for UP traffic) but it "did

4    not set forth any *remedy* for that situation[.]"  *Port of Vancouver USA*, 717 F. Supp. 3d at 1024

5    (emphasis added).  Therefore, on remand, the Parties agreed for the Panel to answer the question

6    of "*how* to determine what constitutes a reasonable and customary rate" (Dkt. No. 27 at 7)

7    (emphasis added), as opposed to "*what* is the reasonable and customary rate"—contemplating

8    not just a singular answer as to rates, but a decisional rule or process for disputes.  (*See id.* at 10.)

9    In other words, by selecting final offer arbitration as the mechanism for settling ongoing disputes

10   under the Switching Book rates, the Panel a) formally adopted a suggestion it had first made in

11   the 2022 Final Offer, and b) responded to this Court's remand and the question posed by the

12   Parties.  Further, as POV notes, nothing about the final offer arbitration process was directly

13   contrary to the WVFAA either, as Article IX of the agreement prohibited the arbitrator from

14   awarding "indirect, special, consequential, punitive or exemplary damages," but was silent as to

15   other remedies.  (Dkt. No. 27 at 6); *see Advest, Inc. v. McCarthy*, 914 F.2d 6, 10–11 (1st Cir.

16   1990) (Selya, J.) ("arbitrators possess latitude in crafting remedies as wide as that which they

17   possess in deciding cases. That leeway is at its zenith when, as here, the arbitration clause

18   imposes no limitations on choice of remedies") (internal citations omitted); *Kenneth H. Hughes,*

19   *Inc. v. Aloha Tower Dev., Corp.*, 654 F. Supp. 2d 1142, 1148 (D. Haw. 2009) (arbitrator could

20   impose pre- and post-award interest as remedy when contract was silent as to that issue).

21        The Panel's choice of remedy is also consistent with caselaw granting arbitrators broad

22   authority to fashion appropriate remedies.  The Ninth Circuit has held that "[t]he remedy ordered

23   in an arbitration does not need to be specifically provided for in the agreements, as long as the

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 11

1    remedy is intended to provide an appropriate remedy to resolve all the disputes between the

2    parties." *Medi-Soft, Inc. v. Royco, Inc.*, 21 Fed. Appx. 570, 572 (9th Cir. 2001); *see also*

3    *Timegate Studios, Inc. v. Southpeak Interactive, L.L.C.*, 713 F.3d 797, 807 (5th Cir. 2013)

4    (upholding arbitrator's choice of remedy not expressly contemplated in the agreement because it

5    was "necessary to *preserve* the essence of the Agreement.")  Likewise, "[a]s long as the

6    arbitrator is *even arguably* construing or applying the contract and acting within the scope of his

7    authority, we cannot overturn his decision simply because it disagrees with his factual findings,

8    contract interpretation, or *choice of remedies*." *Van Waters & Rogers Inc. v. Int'l Bhd. of*

9    *Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. Union 70*, 913 F.2d 736, 739 (9th

10   Cir. 1990) (emphases added); *see also United Paperworkers Int'l Union, AFL-CIO v. Misco,*

11   *Inc.*, 484 U.S. 29, 41 (1987) ("though the arbitrator's decision must draw its essence from the

12   agreement, he 'is to bring his informed judgment to bear in order to reach a fair solution of a

13   problem. *This is especially true when it comes to formulating remedies.*'"); *Executone Info. Sys.,*

14   *Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) ("the arbitrator's selection of a particular

15   remedy is given even more deference than his reading of the underlying contract . . . the remedy

16   lies beyond the arbitrator's jurisdiction only if 'there is no rational way to explain the remedy

17   handed down by the arbitrator as a logical means of furthering the aims of the contract.'");

18   *Advest*, 914 F.2d at 10–11.  In providing for final offer arbitration, the Panel intended to provide

19   a mechanism to resolve any remaining disputes that may arise in implementing and adjusting the

20   Switching Book 8005-E rates, and the Panel was at least "arguably" constructing the contract

21   and acting within its authority in choosing that remedy.

22        In sum, the Court finds no error in the Panel's treatment of rates that would warrant

23   vacatur.

24

1

**C. The Panel Issued a Sufficiently Reasoned Ruling as to Commercial Access**

2    BNSF argues that the Panel failed to issue a reasoned award with respect to its holding on

3  the commercial access requirement.  (*See* Dkt. No. 21 at 22.)  The WVFAA requires the

4  arbitrator to provide "the reasoning for such decision or award in writing."  (*Id.*, quoting

5  WVFAA art. IX, § 4, emphasis omitted; *see also* Dkt. No. 22 at 22.)  The Court finds that the

6  Panel's reasoning is sufficient.

7    Over the course of this dispute, BNSF has argued that its obligation to ensure

8  competitive access to the port is limited by Exhibit F to the WVFAA, which includes rates that

9  apply only to Terminals 4 and 5, and is referenced in Section 3.A.(iii).(b) of the agreement.  *See*

10  *Port of Vancouver*, 717 F.Supp.3d at 1022.  The Panel has repeatedly rejected BNSF's reading of

11  the agreement on this issue, first in the 2022 Partial Final Award, which stated, "The panel finds

12  BNSF's arguments unpersuasive. First, the WVFAA read in its entirety appears to contemplate

13  competitive access to the entire port (with the exceptions noted in Article III Section 3 A (iii))."

14  (*Port of Vancouver I*, Dkt. No. 2-2 at 4.)  The Panel then repeated this statement in the 2022

15  Final Award.  (*See Port of Vancouver I*, Dkt. No. 2-3 at 18.)  But this Court held that more

16  reasoning was needed, as the Panel failed to explain what "access to the entire Port" meant, and

17  failed to interpret "the exception BNSF hangs its hat on."  *Port of Vancouver*, 717 F.Supp.3d at

18  1025.  On remand, the Parties asked the Panel to clarify "What did the Panel mean by 'access to

19  the entire Port (with the exceptions noted in Article III § 3 A (iii),' and whether that included

20  'shippers located at Terminals 2 and 3[.]'"  (Dkt. No. 27 at 7.)[1]  BNSF faults the Panel for

21

22  ---
[1] Under Article III, Section 3.A of the agreement, "BNSF agrees to offer all Rail Customers
23  Commercial Access to UP for so long as the Port is not in default under this Agreement."  (Dkt.
No. 24-1 at 14.)  The term "rail customer" is defined in Article III, Section 3.A.(iii), as follows:

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 13

1    "simply accounc[ing], in a terse six-sentence passage" that it was "rejecting BNSF's

2    interpretation of the WVFAA."  (Dkt. No. 21 at 24.)

3         But under relevant precedents, the Panel's reasoning need not have been exhaustive.  The

4    Ninth Circuit has held that where the parties have contracted for an arbitrator to provide findings

5    of fact and conclusions of law, and the arbitrator fails to do so at all, the arbitrator exceeds their

6    authority under 9 U.S.C. § 10(d), warranting vacatur.  *W. Emps. Ins. Co. v. Jefferies & Co.*, 958

7    F.2d 258, 261 (9th Cir. 1992).  Short of that, Ninth Circuit precedent does not call for vacatur

8    when an arbitrator's reasoning is deficient.[2]  *See Rain CII Carbon, LLC v. ConocoPhillips Co.*,

9    674 F.3d 469, 474 (5th Cir. 2012) (distinguishing a case where the parties had only bargained for

10   a "reasoned award," from *Jefferies*, where the parties bargained for findings of fact and

11   conclusions of law); *see also Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 844 (11th Cir.

12   2011) (observing that "the varying forms of awards may be considered along a 'spectrum of

13   increasingly reasoned awards,' with a 'standard award' requiring the least explanation and

14

15   _____

16        "**Rail Customers**" shall mean rail freight customers owning, controlling and directing in
         their absolute discretion (i.e., no brokers of rail transportation service, etc.,), the terms of
17        freight service for freight originating or terminating at rail accessible facilities located
         now or in the future on POV Property, excepting any such customers (a) with the ability
18        to receive rail service from UP pursuant to written agreements in effect between BNSF
         and UP as of the Effective Date of this Agreement; (b) shipping commodities and/or
19        equipment expressly excluded, with no rates established, or not addressed in the rate
         schedule attached as **Exhibit F**: or (c) originating or terminating freight at a new
20        transload facility which may be established on the Property unless BNSF shall, in its
         reasonable discretion, agree otherwise.

21   (*Id.*; *see also* Dkt. No. 22 at 36 (Exhibit F).)

     [2] Indeed, the Ninth Circuit has stated that "'[a]rbitrators have no obligation ... to give their
22   reasons for an award' at all."  *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No.
     1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1206 (9th Cir. 1989).  But
23   here, the Parties' contract does require at least *some* reasoning.

24

1   'findings of fact and conclusions of law' requiring the most.")  Other circuits have attempted to

2   define the term "reasoned award."  The Second Circuit stated:

3       A reasoned award includes something short of findings of fact and conclusions of law but
        more than a simple result. It requires something more than a line or two of unexplained
4       conclusions, but something less than full findings of fact and conclusions of law on each
        issue raised before the panel. A reasoned award sets forth the basic reasoning of the
5       arbitral panel on the central issue or issues raised before it. It need not delve into every
        argument made by the parties.

6   *Smarter Tools Inc.*, 57 F.4th at 382–383 (cleaned up).  This Court has likewise held that a

7   "reasoned award is something short of findings and conclusions but more than a simple result."

8   *Olson v. Harland Clarke Corp.*, No. C11-5585 BHS, 2014 WL 2589453, at *1 (W.D. Wash.

9   June 10, 2014), *aff'd*, 676 F. App'x 635 (9th Cir. 2017) (quoting *Sarofim v. Trust Co. of the W.*,

10  440 F.3d 213, 215 n. 1 (5th Cir.2006)).  Here, the Parties clearly bargained for a reasoned award,

11  and they specifically asked the Panel on remand to explain what it meant by "'access to the

12  entire Port (with the exceptions noted in Article III § 3 A (iii),' and whether that included

13  'shippers located at Terminals 2 and 3.'"  (Dkt. No. 27 at 7.)  But they did not ask for findings of

14  fact and conclusions of law.

15        Turning to the text of the 2024 Remand Award, the Court finds that it "sets forth the

16  basic reasoning of the arbitral panel on the central issue or issues raised before it" and is thus a

17  sufficiently "reasoned award."  As to commercial access, the 2024 Remand Award stated:

18
        The Panel noted in its Partial Final Award that the "WVFAA read in its entirety appears
19      to contemplate competitive access to the entire port.["] For several reasons, the Panel
        does not find that subclause (b) of Section 3.A.(iii) applies only to the terminal areas
20      referenced in Exhibit F. On that basis, the Panel further clarifies that the Final Award
        granted Commercial Access to all customers in the Port except those excluded by Section
21      3.A.(iii) (a), (b), or (c), when Exhibit F is read to apply only to Terminals 4 & 5.

22  (Dkt. No. 24-1 at 15.)  The Court finds this passage, while short, adequately addresses the central

23  issues.  In this passage, the Panel reaffirmed that the WFVAA when read in its entirety

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 15

contemplates competitive access to the entire Port.  In that vein, it then found subclause (b) of Section 3.A.(iii) applies to all terminal areas, not just the terminal areas referenced in Exhibit F, even assuming Exhibit F applies only to terminals 4 & 5.  Based on the finding that subclause (b) applies to all terminals, commercial access was granted to all customers in the Port except those excluded in subclauses (a), (b), or (c), even when Exhibit F is read to apply only to terminals 4 & 5.  The Panel's brief reasoning addresses the questions posed by the Court and Parties, and it is more than a "simple result."  Though further reasoning could have been helpful, it was not required.  As the Eleventh Circuit stated:

> To be sure, the Panel could have provided more. But again, had the parties wished for a greater explanation, they could have requested that the Panel provide findings of fact and conclusions of law; to this court, the statement quoted above is greater than what is required in a "standard award," and that is all we need decide.

*Cat Charter, LLC*, 646 F.3d at 845.  At a minimum, the Panel's explanation is not so devoid of reasoning that vacatur is appropriate.

### D.  The Panel Did Not Exceed Its Authority with Respect to Alien Cars

The Panel clarified its prior ruling with respect to alien cars.  In the 2022 Final Award, the Panel decisively rejected BNSF's position that the WVFAA allows it to use POV property for non-Port purposes.  The Panel stated:

> [A]t a fundamental level, BNSF's use of Port property for non-Port purposes is inconsistent with access to the Port by two Class I railroads which plainly emerges as central to both parties' intent and understanding in agreeing to the WVFAA. BNSF's use of POV trackage to store rail cars not related to deliveries to or from the Port could displace or disrupt the potential availability of that trackage to accommodate deliveries to or from UP. POV's interest in avoiding BNSF's storage of alien rail cars without compensation is obvious. . . .

> The panel finds that BNSF overreads the language of the WVFAA in asserting that BNSF's use of POV trackage is essentially divorced from traffic related to POV or its tenants. It may well be that in switching rail cars on POV trackage some rail cars not destined for POV tenants may from time to time be included in switching cars. But

BNSF's use of POV trackage appears far more extensive, including rail cars of essentially every description and for other than limited or short periods.

(*Port of Vancouver I*, Dkt. No. 2-3 at 23–24.)  However, the Panel rejected POV's proposed rate of compensation for BNSF's past use of POV property for alien cars as excessive, instead settling on BNSF's proposed rate of $7 per day.  (*Id.* at 25.)

The Court found that the Panel needed to address several issues that remained unresolved with respect to alien cars.  While the Panel clearly "interpreted the contract to foreclose BNSF from storing alien cars on POV property" its language stating that alien cars may "from time to time" exist on the property left open the question of "whether the presence of *any* alien car violates the agreement." *Port of Vancouver USA*, 717 F. Supp. 3d at 1015–1026.  Further, the Panel did not specify "how many alien cars BNSF is permitted to keep on the property, whether it incurs storage rates for those cars, and whether the rate is $7 [applicable] in the future." *Id.* at 1026.  Based on the Court's remand, the Parties asked the Panel to clarify, "'[w]hether, under what circumstances, and to what extent BNSF is permitted to bring [alien] rail cars on to Port property,' and if so 'was the $7 per car damages established by the Panel intended to apply prospectively.'"  (Dkt. No. 27 at 8.)

The Panel's answer to these questions was unambiguous.  The 2024 Remand Award held that "the WVFAA does not permit BNSF to *intentionally* bring alien cars onto Port property or to store them there." (Dkt. No. 24-1 at 15) (emphasis added).  The Panel clarified that its prior statement that "'some rail cars not destined for POV tenants may from time to time be included in switching cars' merely acknowledged that it was likely that alien cars would occasionally and inadvertently end up on Port property." (*Id.*)  The Panel further clarified that it "did not intend the $7 per car rate established in the Final Award to apply after the date of the Final Award"—

1  and that any prospective relief for violations falls outside the scope of the 2022 Final Order.

2  (*Id.*)

3        BNSF now argues that the Panel impermissibly reversed itself by initially holding that

4  alien cars were allowed for "'short periods' when 'included in switching cars'" but subsequently

5  holding that alien cars are prohibited "for any reason or any period of time." (*See* Dkt. No. 21 at

6  26.)  The Court disagrees that the Panel's decisions are inconsistent.  The 2022 Final Award held

7  that the WVFAA did not allow for alien cars, but acknowledged the possibility of inadvertent

8  lapses.  At the direction of the Court and Parties, the 2024 Remand Award clarified that such

9  language should not be read as a grant of permission for BNSF to intentionally bring alien cars

10  onto POV property.  In other words, both opinions hold that BNSF cannot *intentionally* bring

11  alien cars onto POV property for any period of time, and they are consistent on that point.  The

12  Panel further answered the Court and Parties' question regarding prospective application of the

13  $7 per day rate, holding that the rate does not apply prospectively.  Nothing more is required.[3]

14                          **V        CONCLUSION**

15        The FAA and applicable caselaw set out a highly deferential standard for confirmation of

16  arbitration awards.  Nonetheless, in a previous iteration of this case, this Court found that an

17  arbitral award was too vague and indefinite for judicial enforcement.  The Parties returned to the

18  same arbitration Panel seeking clarification of its prior award in response to the Court's order,

19  and the Panel provided the necessary clarifications.  Applying the deferential standard of review,

20  the Court finds no basis to vacate the clarified award.  To this point, BNSF has apparently

21

22

23  [3] BNSF argues that after vacating the award, this Court should remand to a new arbitration panel.
    (Dkt. No. 21 at 27.)  Because the Court denies the motion to vacate, it does not reach this
24  argument.

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 18

1  avoided compliance with the Panel's directive to provide nondiscriminatory rates to its

2  competitor, and its continued objections to enforcement are unpersuasive.

3      For those reasons, the Court GRANTS the Motion to Confirm (Dkt. No. 24) and DENIES

4  the Motion to Vacate (Dkt. No. 21.)

5

6      Dated this 26th day of March, 2025.

7

8                                  David G. Estudillo

9                                  United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER GRANTING MOTION TO CONFIRM ARBITRATION AWARD (DKT. NO. 24) AND DENYING
MOTION TO VACATE (DKT. NO. 21) - 19